## ROSENTHAL et al. v. NEW YORK LIFE INS. CO.*
## No. 10938.

Circuit Court of Appeals, Eighth Circuit.
Feb. 21, 1938.

*Rehearing denied March 11, 1938.

Douglas W. Robert, of St. Louis, Mo., for appellant Esther Rosenthal.

James C. Jones, Jr., of St. Louis, Mo. (James C. Jones, Lon O. Hocker, Frank Y. Gladney, and Joseph H. Grand, all of St. Louis, Mo., and Louis H. Cooke, of New York City, on the brief), for appellee.

Before STONE, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

This is a suit in equity brought by the New York Life Insurance Company to cancel two reinstatements of a $7,000 policy of life insurance upon the joint lives of Joseph Rosenthal and Esther Rosenthal and payable to the survivor of them if either should die while the policy was in force. It was alleged in the complaint that the reinstatements were fraudulently procured and had been rescinded by the company. Joseph Rosenthal died May 14, 1933. This suit was commenced June 2, 1934, against Esther Rosenthal and Lafayette South Side Bank & Trust Company, assignee of the policy. Esther Rosenthal in her answer, in effect, denied that the reinstatements were procured by fraud, denied that the policy was not in force at the time of the death of Joseph Rosenthal, and asserted a counterclaim praying for the cancellation of the company's records showing the forfeiture of the policy; and for the cancellation of the assignment of the policy to the bank; and praying also that a decree be entered awarding to her

$5,478 (the face of the policy less the policy loan) with interest from May 14, 1933, and costs. The bank's answer was similar to that of Esther Rosenthal, except that the bank asserted that it was the assignee of the policy, and in its counterclaim it asked for a decree for $6,760.29 (the amount which it claimed was due from the company upon the policy at the time of Joseph Rosenthal's death) with interest from May 14, 1933, and costs. The court, after a trial, found that the reinstatements of the policy were fraudulently procured and were subject to cancellation; that the company, upon discovery of the fraud, had rescinded the reinstatements; that upon rescission the defendants were entitled to receive from the company $161; that the policy lapsed for nonpayment of the premium due on June 6, 1932, and was continued in force as extended insurance in the sum of $5,809.20 for a period of 260 days from June 6, 1932, or to February 21, 1933. The court did not determine the validity of the assignment of the policy to the bank. A decree canceling the reinstatements and dismissing the counterclaims of the defendants was accordingly entered, and this appeal followed.

The controlling facts upon which we must decide the questions presented by the appellants are not in substantial dispute, and are briefly as follows:

The policy was dated June 6, 1924, and was "made in consideration of the payment in advance of the sum of $383.46 * * * constituting the first premium and maintaining this policy to the Sixth day of June, Nineteen Hundred and Twenty-five, and of a like sum on said date and every twelve calendar months thereafter until the death of one of the Insured." The policy provided also that it was to be effective as of June 6, 1924, "which day is the anniversary of the Policy"; that "after three full years' premiums have been paid, the insured may, at the end of any insurance, or within three months after any default in payment of premium but not later, surrender the policy, and" receive the amount of paid-up insurance which the cash surrender value at the date of default, less any indebtedness, would purchase; that if within three months after default the policy was not surrendered for cash or for paid-up insurance, its cash surrender value at date of default, less any indebtedness, was to be automatically applied to purchase extended insurance from the date of default for the face of the policy plus dividend additions and less any indebtedness to the company. The policy contained the usual provisions as to grace in the payment of premiums; for reinstatement "upon written application by the insured and upon presentation at the Home Office of evidence of insurability satisfactory to the Company," and that the policy should be incontestable after two years from its date of issue, except for nonpayment of premium. The applications of the insured attached to the policy provided that the insurance should not take effect unless and until the policy was delivered to and received by the insured and the first premium paid in full during the insured's lifetime. The policy was apparently delivered on June 16, 1924, and a note accepted by the agent for the first premium, and the first premium was actually paid to the company September 26, 1924.

The premium due June 6, 1932, was not paid. On June 29, 1932, within the grace period, the insured paid $52.50 on account of the defaulted premium and gave a "blue note" for $330.96, dated June 6, 1932, due October 6, 1932, for the balance of the defaulted premium. This "blue note" contained the following provision:

"This note is accepted by said company at the request of the maker together with $52.50 in cash on the following expressed agreement:

"That although no part of the premium due on the 6th day of June, 1932, under Policy 8777241 issued by said company on the life of ———— has been paid, the insurance thereunder shall be continued in force until midnight of the due date of said note. That if this note is paid on or before the date it becomes due, such payment together with said cash, will then be accepted by said Company as payment of said premium, and all rights under said policy shall be the same as if said premium had been paid when due; that if this note is not paid on or before the date it becomes due, it shall thereupon automatically cease to be a claim against the maker, and said company shall retain said cash as part compensation for the rights and privileges hereby granted, and all rights under said policy shall be the same as if said cash had not been paid nor this agreement made except only that the time within which the owner may make a change of benefits after lapse, as provided in said policy, is hereby extended for three months after the due date of this note, but no longer. * * *"

The "blue note" was not paid at maturity, and the policy lapsed.

Each of the insured made application for reinstatement on October 11, 1932; and, in reliance upon the statements as to insurability contained therein, which were to the effect that each of the insured was in the same state of health at that time as when the policy was issued, and that neither had any illness, disease, or bodily injuries or had consulted or been treated by any physician or physicians within the past two years, the company on October 14, 1932, reinstated the policy upon the payment of $52.50 and the execution of another similar "blue note" for $278.46, dated June 6, 1932, and due January 6, 1933. The insured did not pay this note at maturity, and the policy again lapsed.

On January 10, 1933, the insured again applied for reinstatement. Their applications contained the same representations as to insurability as were contained in the former applications for reinstatement, and the company on January 11, 1933, again, in reliance upon these representations, reinstated the policy. On January 27, 1933, the insured paid $80.03 on account of the premium due June 6, 1933, and the balance was paid by increasing their policy loan.

On March 6, 1933, the company learned for the first time that Joseph Rosenthal was in the last stages of syphilis, had been disabled since August 8, 1929, and had been receiving treatments from physicians for this disease. After an investigation, the company, by letter of April 7, 1933, notified the insured and the bank, the assignee of the policy, that, because of the falsity of the representations contained in the applications for reinstatement made by Joseph Rosenthal, it elected to rescind the reinstatements of the policy; that it had restored the policy loan indebtedness to $1,321, the amount owing on June 6, 1932, and had foreclosed the loan by deducting that amount with accrued interest from the value of the policy as of the date of its lapse on June 6, 1932; that the reserve value of the policy as of that date was sufficient to purchase extended insurance for $5,810 for 105 days, or from June 6, 1932, to September 19, 1932; and that, that period having expired, the policy was of no value. Inclosed in the letter was a check payable jointly to the insured and the bank for $267.12, and in the letter the company offered "to do whatever else, if anything, it ought to do for the purpose of such rescission." This letter was not answered, and the check was never returned. Joseph Rosenthal died as a result of syphilis May 14, 1933. When this suit was commenced, in order to make good its tender, the company paid into court $286. Later, by permission of the court, the company reduced this deposit to $161.

Stated briefly, the contentions of the appellants are:

(1) The reinstated policy was not a new contract. The incontestable period ended two years from the date of the issue of the original policy and did not run anew from the date of its reinstatement.

(2) The date when extended insurance became effective was to be ascertained with respect to the date the policy was delivered and the first premium paid.

(3) The premium due June 6, 1932, was paid on June 29, 1932, by cash and by note due October 6, 1932, and the policy was in full force until the latter date.

(4) The company, because of its delay, waived the right to rescind the reinstatements, and this suit is barred by laches.

(5) The tender which the company made in connection with its rescission was insufficient and did not restore the status quo.

(6) There was a failure of consideration for the assignment of the policy to the bank, and Esther Rosenthal was entitled to rescind the assignment.

1. In considering the effect of the incontestable clause of the policy, it is necessary to keep in mind that the company makes no attack upon the policy. Its attack is directed solely to the agreement whereby the policy was reinstated or restored. If there was no valid reinstatement of this lapsed policy, it remained a lapsed policy. It is true, as the defendants contend, that a reinstated policy is not a new contract; it is an old contract which has been restored (Business Men's Assurance Co. v. Scott, 8 Cir., 17 F.2d 4; Trapp v. Metropolitan Life Ins. Co., 8 Cir., 70 F.2d 976); but the agreement whereby a lapsed policy is reinstated and restored is a new agreement (Wastun v. Lincoln National Life Ins. Co., 8 Cir., 12 F.2d 422, 425). With reference to the effect of the incontestable clause upon a reinstated policy, Prof. Vance, in his work on Insurance, 2d Ed., has this to say (page 825):

"Where the policy containing an incontestable clause has lapsed for nonpayment of premiums, or for other cause,

and has been reinstated, it may become important to determine whether the incontestable period shall be computed from the date of reinstatement, or from the date of original issue. A distinction should be made, in computing the contestable period, between those defenses arising out of the provisions of the policy itself and those defenses arising out of transactions connected with the reinstatement. In the former case the contest period should begin, not from the date of reinstatement, but from the date of original issue. Thus where the contest period has expired before the policy was allowed to lapse, the insurer could not defend on the ground that the original policy avoided liability for suicide within a year. But where the insurer's defense is based on some transaction connected with and resulting in the reinstatement, the running of the incontestable clause, as to this defense, should be computed from the date of reinstatement. Thus where the insurer asserts that the reinstatement was obtained through fraud, he may raise this defense at any time before the expiration of the contest period, reckoned from the date of reinstatement, even though the reinstatement agreement itself contained no incontestable clause."

■ The rule that the incontestable clause runs from the date of reinstatement, where the insurer's defense is fraud in the procurement of the reinstatement, is sustained by the great weight of authority, both federal and state. Lincoln Nat. Life Ins. Co. v. Hammer, 8 Cir., 41 F.2d 12, 17; State Life Insurance Co. v. Spencer, 5 Cir., 62 F.2d 640; New York Life Insurance Co. v. Seymour, 6 Cir., 45 F.2d 47, 49, 73 A.L.R. 1523; Great Western Life Insurance Co. v. Snavely, 9 Cir., 206 F. 20, 46 L.R.A., N.S., 1056; Lanier v. New York Life Insurance Co., 5 Cir., 88 F.2d 196; Wallach v. Aetna Life Insurance Co., 2 Cir., 78 F.2d 647; Tatum v. Guardian Life Ins. Co., 2 Cir., 75 F.2d 476, 98 A.L.R. 341; Mutual Life Ins. Co. v. Dreeben, D.C., 20 F.2d 394, affirmed Dreeben v. Mutual Life Ins. Co., 5 Cir., 29 F.2d 963; McCormack v. Security Mutual Life Ins. Co., 220 N.Y. 447, 116 N.E. 74; Ward v. New York Life Ins. Co., 129 S.C. 121, 123 S.E. 820; State Mutual Ins, Co. v. Rosenberry, Tex. Com.App., 213 S.W. 242; Pacific Mutual Life Ins. Co. v. Galbraith, 115 Tenn. 471, 91 S.W. 204, 112 Am.St.Rep. 862.

2. It is essential that in contracts of life insurance the date when the policy was issued and the dates when premiums are due shall be definitely fixed, in view of the provisions relative to incontestability, lapse, reinstatement, days of grace, surrender values, loan values, paid-up insurance, extended insurance, and other obligations the definite ascertainment of which must be based upon the date of the issuance of the policy or the dates when premiums are due. If the dates specified in the policy are to be varied to meet the exigencies of each particular case, so that in one the specified date of issue—although not the date when the first premium was paid or the policy delivered—is to be taken to prevent the insurer's contesting the policy, while in another case the date specified is to be ignored in favor of the date when the policy was actually delivered or the first premium actually paid by the insured, so as to extend the coverage of a lapsed policy beyond the date of death, an uncertain and confusing situation is produced which, while it may bring about in a given case a result believed to be desirable, renders policies of insurance indefinite which should be definite, promotes litigation, and may injuriously affect the rights of other policyholders. In Williams v. Union Central Life Insurance Co., 291 U.S. 170, 180, 54 S.Ct. 348, 352, 78 L.Ed. 711, 92 A.L.R. 693, Mr. Chief Justice Hughes, in delivering the opinion of the court, said:

"While it is highly important that ambiguous clauses should not be permitted to serve as traps for policyholders, it is equally important, to the insured as well as to the insurer, that the provisions of insurance policies which are clearly and definitely set forth in appropriate language, and upon which the calculations of the company are based, should be maintained unimpaired by loose and ill-considered interpretations."

It is to be remembered that modern life insurance involves something more than indemnity in case of death. The insured's contributions build up reserves, surrender values, and loan values, and entitle insured to dividends. In some forms of life policies, the investment and savings features overshadow death benefits.

■ It is a sound and well-established rule that the date of issue of the policy and dates when premiums are due are to be taken as those agreed to by the parties in the policy. Klein v. New York Life Insurance Co., 104 U.S. 88, 91, 26 L.Ed. 662; Mutual Life Insurance Co. v. Hurni Pack-

ing Co., 263 U.S. 167, 175, 44 S.Ct. 90, 91, 68 L.Ed. 235, 31 A.L.R. 102; Bergholm v. Peoria Life Insurance Co., 284 U.S. 489, 492, 52 S.Ct. 230, 231, 76 L.Ed. 416; Trapp v. Metropolitan Life Insurance Co., 8 Cir., 70 F.2d 976, 980; New York Life Insurance Co. v. Silverstein, 8 Cir., 53 F.2d 986, 989; Shira v. New York Life Insurance Co., 10 Cir., 90 F.2d 953, 956; Meadows v. Continental Assurance Co., 5 Cir., 89 F.2d 256, 260; Horwitz v. New York Life Insurance Co., 9 Cir., 80 F.2d 295, 299; Jones v. Jefferson Standard Life Insurance Co., 5 Cir., 79 F.2d 640, 641; Travelers Insurance Co. v. Wolfe, 6 Cir., 78 F.2d 78, 81. As has been pointed out, in many of these cases there is no inconsistency created by the provision of the contract that the insurance shall not become initially effective until the policy is delivered and the first premium is paid. It is true that if the insured dies before the delivery of the policy and the payment of the first premium, his beneficiary will collect nothing. On the other hand, the insurer has received nothing up to that time, and the purpose of the provision is doubtless to prevent persons who cannot pay for insurance from securing insurance on their lives for short periods without consideration. There is nothing to prevent an insurer and an insured from agreeing that the insurance contracted for shall not take effect until the policy, the written evidence of the agreement, is in the hands of the insured and until the insured has made his initial payment, and that when those events have occurred the policy shall be fully effective from the agreed date of issue for all purposes. This agreement, if the initial premium is paid at a later date than the agreed date of issue of the policy, may result in the insurer receiving compensation for a period during which no liability was imposed upon it. On the other hand, upon delivery of the policy and the payment of the first premium, the insured secures those advantages which flow from having the policy become effective as of the earlier date. This affects the period of its contestability, its loan and surrender values, dividends, and, in some instances, the rate of premium. The provision also affords the insured an opportunity of ascertaining in advance of the payment of any premium whether the policy which is delivered to him is the policy for which he applied and for which he desires to pay.

■ 3. The giving of the "blue note" on June 29, 1932, and the payment of $52.50

on that date did not prevent the lapse of the policy for nonpayment of the premium due June 6, 1932, since the parties agreed, by the terms of the "blue note," that the failure to pay the note when due should leave the policy in default for the nonpayment of the premium of June 6, 1932. See Slocum v. New York Life Insurance Co., 228 U.S. 364, 373, 374, 33 S.Ct. 523, 57 L.Ed. 879, Ann.Cas.1914D, 1029; Wastun v. Lincoln National Life Insurance Co., 8 Cir., 12 F.2d 422, 424, 425; Jeffers v. Bankers' Life Co., 5 Cir., 71 F.2d 603, 604; Bankers' Life Co. v. Burns, 5 Cir., 30 F.2d 327, 328. The surrender value of the policy and the amount of paid-up or extended insurance which its value would purchase was to be ascertained as of June 6, 1932.

■ 4. The contention that the company, because of its failure to act more promptly in giving to the insured notice of rescission of the reinstatements, waived its right to rescind, is clearly without merit. The company ascertained on March 6, 1933, that the representations contained in the applications for reinstatement made by Joseph Rosenthal were false. It investigated the facts, and, after a reference of the matter to its actuarial and law departments, gave notice of rescission on April 7, 1933, which was one month after it first had reason to believe that the reinstatements had been fraudulently procured. This was not an unreasonable delay. Hesselberg v. Aetna Life Insurance Co., 8 Cir., 75 F.2d 490; Shaner v. West Coast Life Insurance Co., 10 Cir., 73 F.2d 681.

■ The failure of the company to commence suit prior to June 2, 1934, did not constitute laches. A sufficient answer to the contention that it did is that the company had the right to contest the validity of the reinstatements within two years, as has already been pointed out, and mere delay in the bringing of the suit would not amount to laches. Johnson v. Umsted, 8 Cir., 64 F.2d 316, 323; Fountain & Herrington v. Mutual Life Insurance Co., 4 Cir., 55 F.2d 120, 125, 126; Robert Hind, Ltd., v. Silva, 9 Cir., 75 F.2d 74.

■ 5. The defendants contend that the company did not make a sufficient tender in order to restore the status quo as of June 6, 1932. In that connection they argue that the surrender value of the policy was on that date in fact sufficient to

carry the policy beyond the date of Joseph Rosenthal's death.

The insured had borrowed $1,321 upon this policy on July 7, 1931, at 6 per cent. interest. On June 6, 1932, accrued interest on the loan was $72.52; dividends to the credit of the policy were $327.74, out of which, at the request of the insured, was paid the accrued interest on the loan, $72.52, and the $52.50 cash payment referred to in the "blue note" dated June 6, 1932. The balance of dividends was therefore $202.72. The cash or surrender value of the policy was at that time $1,239. Adding to this dividends of $202.72 gave the policy a total value of $1,441.72. After deducting the policy loan of $1,321, there was left a net equity of $120.72, which was sufficient to continue $5,882 ($5,881.72) of the insurance ($7,000, the face of the policy, plus $202.72, the dividend addition, less $1,321, the amount of the policy loan) for 260 days, or from June 6, 1932, to February 21, 1933. The defendants contend that there was a net equity of $173.22, but they have included the $52.50 which was deducted from dividends on June 29, 1932, at the insured's request, to extend the insurance to October 6, 1932, under the terms of the "blue note." This $52.50 the company, by the terms of the "blue note," was clearly entitled to retain. It was the consideration for the protection and privileges granted to the insured under the terms of the note, and, having been deducted from dividends and earned by the company, it cannot be included in the value of the policy on June 6, 1932. The $161 which the court found was the amount that was due from the company by way of the return of cash premiums which had been paid by the insured after the reinstatements of the policy, was not available for the purchase of extended insurance, and had nothing to do with the value of the policy as of June 6, 1932.

 There is, however, one defect in connection with the attempted restoration of the status quo. The company gave notice of rescission on April 7, 1933. Since the insured were then alive, the granting of extended insurance to September 19, 1932 (or to February 21, 1933), was the equivalent of giving them nothing of value in exchange for the cash value of the policy as of June 6, 1932, and in practical effect amounted to a forfeiture of that value. It is true that the policy provided for extended insurance if none of the other options available to the insured upon default in the payment of premium were selected within three months. But here the insured were never afforded an opportunity to make an election after the rescission of the reinstatements. Our opinion is that the company, upon the rescission of the reinstatements, should have offered to the insured the opportunity to choose either the surrender value of the policy on June 6, 1932, or the amount of paid-up insurance which the net value of the policy on that date would have purchased. That would have been restoring to the insured the right to elect how the net value of their lapsed policy should be used. Since they were offered no opportunity to make an election prior to the death of Joseph Rosenthal, we think that the company should have been required to pay into court, in addition to the $161 return premiums, an amount equal to the amount of paid-up insurance which the net value of the policy would have purchased on June 6, 1932. This would be the equivalent of permitting the beneficiary of the policy to select the most favorable option which was available to the insured on June 6, 1932. The company has at all times been ready, willing, and able to do whatever is required in order to restore the status quo as of June 6, 1932, and its failure to restore to the insured their right to elect whether they would take surrender value, paid-up insurance, or extended insurance, does not, under the circumstances, defeat its right to a decree canceling the reinstatements for fraud. The decree should be so conditioned that the beneficiary may have all that she would or might have received had the applications for the reinstatements not been made and had the insured selected the most favorable option available after lapse of the policy. That the decree may be so conditioned is evidenced by the following cases: Shaner v. West Coast Life Insurance Co., 10 Cir., 73 F.2d 681, 685; Perkins v. Prudential Insurance Co. of America, 7 Cir., 69 F.2d 218, 221; New York Life Insurance Co. v. Sisson, D.C., 19 F.2d 410; Twin Lakes Land & Water Co. v. Dohner, 6 Cir., 242 F. 399, 402.

 Apparently the Lafayette South Side Bank & Trust Company had no real interest in this litigation. Nominally it was the assignee of the policy. There was testimony that the assignment to it was given as additional security under an agreement between the insured and the bank that certain mortgages held by the bank on

property belonging to the insured would be extended; that this agreement was never carried out and that there was a complete failure of consideration for the assignment. The bank introduced no evidence to the contrary. It filed in this court no brief, but adopted the brief of Esther Rosenthal, in which she contends that the court should have found that the assignment was invalid. Under the circumstances, we feel justified in holding that Esther Rosenthal is the only party having an interest in the policy in suit, and that the bank is entitled to nothing.

Our conclusion is that the decree should be amended so as to provide that the company, in addition to the $161 referred to, shall pay into court, for the benefit of Esther Rosenthal, an amount equal to the paid-up insurance which the net value of the policy on June 6, 1932, would have purchased, with interest from May 14, 1933, and that the Lafayette South Side Bank & Trust Company, as the assignee of the policy, is entitled to no relief. As so amended, the decree will stand affirmed.