# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### NOVEMBER 16, 2004 Session

## NICCOLE A. NAIFEH, ET AL. v. VALLEY FORGE LIFE INSURANCE COMPANY, ET AL.

**Direct Appeal from the Chancery Court for Tipton County**
**No. 18813      Dewey C. Whitenton, Chancellor**

_____

**No. W2003-02800-COA-R3-CV - Filed May 5, 2005**

_____

This appeal arises out of the interpretation of a life insurance contract. The trial court determined that the Decedent's life insurance policy was in effect and had not lapsed due to Decedent's failure to pay the premium due in January 2000. It ordered Valley Forge Life Insurance Company to pay the sum of $1,000,000.00 to Cathy Naifeh plus prejudgment interest of 8% per annum beginning on June 1, 2000. The lower court dismissed Valley Forge Life Insurance Company's counterclaim against William McGowan, Jr. and Bill McGowan & Company. Further, it dismissed the claim of Decedent's estate and Cathy Naifeh against Bill McGowan, Jr. and Bill McGowan & Company for negligent misrepresentation and their claims against Union Planters Bank. Finally, it dismissed the claims of Decedent's estate and Cathy Naifeh against Union Planters Bank, William McGowan, and Valley Forge Life Insurance Company for violations of the Tennessee Consumer Protection Act. Valley Forge Life Insurance Company now seeks review by this Court. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part; Reversed in Part and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Sam B. Blair, Jr., John B. Starnes, Memphis, TN, for Appellant Valley Forge Life Insurance Company

J. Houston Gordon, Covington, TN, for Appellees Niccole Naifeh and Henry Joseph Naifeh, Co-Administrators of the Estate of John H. Naifeh

James S. Wilder, III, Dyersburg, TN, for Appellee Cathy Ann Lyles Naifeh

Walker T. Tipton, Covington, TN, for Appellee Union Planters Bank

J. Kimbrough Johnson, Memphis, TN, for Appellees Bill McGowan, Jr. and Bill McGowan and Company

**OPINION**

**Facts and Procedural History**

In 1998, John H. Naifeh ("Naifeh" or "Decedent") was in the midst of a divorce action with Cathy Ann Lyles Naifeh ("Cathy"). While negotiating the marital dissolution agreement, Naifeh decided to apply for a life insurance policy to secure the alimony obligation he anticipated having when the final decree of divorce was entered. Naifeh approached William McGowan, Jr. ("McGowan"),[1] an independent insurance agent and longtime friend of Naifeh and Cathy, to begin the application process. McGowan received a proposal from Valley Forge Life Insurance Company ("Valley Forge") which listed Naifeh's age[2] for the policy as fifty-one (51) and listed the classification as "Male Preferred Nonsmoker 2." After notifying Naifeh of the rate at which the premium payments were set, on August 31, 1998, McGowan and Naifeh filled out the application,[3] and Naifeh wrote a check for a premium payment in the amount of $149.99.[4] On the application, Naifeh stated that he did not use any tobacco products.

Naifeh submitted to a medical examination on September 21, 1998. Representatives of Valley Forge learned that Naifeh occasionally smoked cigars. As a result, Valley Forge sent Naifeh an additional questionnaire, which Naifeh filled out and dated November 3, 1998, and stated that he had, for the previous year, smoked one cigar every two to three weeks. Pursuant to an internal policy established on October 9, 1998, Naifeh was reclassified with a rating of "nonsmoker class 4," effectively rejecting the originally proposed "nonsmoker class 2" arrangement and increasing the premium amount. This new policy was approved by Valley Forge underwriters on November 19, 1998, and drawn up in document form on November 23, 1998. The new policy called for a monthly premium rate of $214.33 for the first year.[5]

---

[1] Where appropriate, references to "McGowan" shall also include Bill McGowan & Company.

[2] Naifeh's birthday is January 27, 1947, and he was, chronologically, fifty-one years of age in August 1998.

[3] Though under item 14 of the application the words "Date to Conserve age 51" appear, the undisputed testimony at trial was that this language was added after Naifeh signed the application.

[4] This amount was the monthly premium amount for a "class 2 nonsmoker" which was the rating Naifeh was quoted at the time of the application.

[5] The first year of the policy with Valley Forge included a fifteen percent (15%) discount on the annual premium amount.

At this point, McGowan attempted to contact Naifeh to have him write another check reflecting the increased premium. Cathy learned that McGowan was attempting to contact Naifeh, and she spoke with McGowan, explaining that Naifeh was in Las Vegas but would be returning after the Thanksgiving holiday. McGowan explained that Naifeh only needed to fill out an additional form and sign it. Cathy further asserts that McGowan stated he would "keep her posted" about matters concerning the life insurance policy though McGowan disputes making this statement. When McGowan reached Naifeh, Naifeh wrote out a check in the amount of $278.67[6] on December 1, 1998, for the increased premium amount. On December 9, 1998, $642.99[7] was electronically transferred from Naifeh's bank account to pay the premium on the life insurance policy. Later that month, on December 29, 1998, $214.33 was electronically transferred to pay the monthly premium.

On December 10, 1998, a final decree of divorce was entered between Naifeh and Cathy. The decree provided, in relevant part, as follows:

> 3. LIFE INSURANCE. Husband shall maintain a $1 million life insurance policy on his life, with Wife as the irrevocable, sole beneficiary of said policy, and with Wife's son, John Andrew McCullough, as the secondary irrevocable beneficiary in the event that Wife predeceases Husband. Said life insurance shall be maintained for a period of twenty (20) years from the date of execution of this Marital Dissolution Agreement. Husband shall not pledge, borrow against or encumber said insurance policy. Husband is to furnish to Wife the name and address of the insurance company issuing said life insurance policy, the policy number, the group number (if any) and the name and address of the insurance agent through whom the policy was purchased. Husband, by his signature hereto, does hereby release and authorize any insurance company, agent and/or representative who has knowledge or information regarding the status and issuance of said policy to communicate fully with Wife as to said policy and the status thereof in regard to any and all premium payments. Husband, upon Wife's demand, shall exhibit to Wife evidence that said insurance is in full force and effect and that the policy is being maintained per the provisions set forth hereinabove. Husband agrees to execute the necessary documents to have said insurance premiums paid directly from his bank account. If for any reason Husband does not maintain said life insurance as required by this provision or, if for any reason said insurance is not paid to Wife upon Husband's death (or to Wife's son if Wife predeceases Husband), Husband's estate shall be responsible for paying to Wife (or to Wife's son if Wife predeceases Husband) the sum of One Million Dollars ($1,000,000.00).

---

[6]This amount includes a monthly premium payment under the new "nonsmoker class 4" classification ($214.33) plus the difference between the amount on the first check Naifeh wrote and the new premium amount ($64.34).

[7]This amount equals three premium payments for the monthly rate of $214.33.

On January 25, February 25, March 25, April 26, May 25, and June 28, 1999, the monthly premium amount of $214.33 was electronically transferred from Naifeh's bank account at First State Bank[8] to Valley Forge. On July 26, August 25, September 27, October 25, November 26, and December 29, 1999, the monthly premium amount of $251.00[9] was electronically transferred from Naifeh's bank account.

On January 10, 2000, Vicki Atkins ("Atkins"), an employee for First State Bank, received by phone and entered an oral order to cancel the payment of $251.00 due to Valley Forge on January 25, 2000. Atkins, after requesting the account number from which electronic transfers were drawn, verified that the order was authorized by checking the amount of the electronic transfer for which cancellation was requested, the name of the payee on the transfer, the social security number of the account holder, and the date of the account's last deposit.[10] Though First State Bank had a policy to request signatures of parties requesting a stop payment order, its regular procedure was to keep the stop payment order in place even without a signature for a period of six months. First State Bank, and its successor, Union Planters Bank, never received a written order from Naifeh to stop payments to Valley Forge. Subsequently, the premium payment of $251.00 due on January 25, 2000, was returned and not paid to Valley Forge.

On February 15, 2000, First State Bank was converted into a branch for the Union Planters Bank ("Union Planters"). Because First State Bank's stop payment orders could not be transferred onto the Union Planters database electronically, all stop payment orders with First State Bank were entered manually. As a result, Union Planters sent a notice to Naifeh, dating the stop payment order on February 18, 2000, and requesting Naifeh's signature to authorize the stop payment order beyond the 14-day period permitted for oral stop payment orders.

Valley Forge alleges that it sent a notice to Naifeh in a letter dated February 3, 2000, informing Naifeh that his premium payment due on January 25, 2000, was returned and the mode of paying his premiums had been switched to quarterly billing. As a result, the stated amount due was $758.76. Additionally, McGowan alleges he mailed Naifeh a letter dated February 18, 2000, notifying Naifeh that he was delinquent on his monthly premium payment due on January 25, 2000.

Concerning late payments, the insurance policy contained the following provision:
3.23: GRACE PERIOD – After the first premium, a Grace Period of 31 days from the Premium Due Date will be granted for the payment of every premium. Your policy will stay in force during the Grace Period. If the Insured dies during the Grace

---

[8]The First State Bank was not named as a defendant in the lawsuit because it became a branch for Union Planters Bank on February 15, 2000.

[9]The premium amount increased at this point because the fifteen percent (15%) discount, applicable during the first year the policy was in, effect, ended.

[10]Though Atkins asked for and received all requests for verification, she could not, at the time of trial, testify for certain that the person requesting the cancellation was John Naifeh.

Period, we will deduct any unpaid premium for the Policy Month in which the Insured dies prior to the payment of any proceeds, as described in section 2.11.

If the Grace Period ends without the payment of any unpaid premium, this policy will terminate as of the Premium Due Date.

Naifeh did not make any further payments on the insurance policy. He suffered terminal injuries in a car accident and died on March 13, 2000. Subsequently, Valley Forge refused to pay any claim related to the life insurance policy on Naifeh's life.

As a result, Cathy and Naifeh's estate (collectively the "Plaintiffs") filed a complaint on July 31, 2000,[11] against Valley Forge, McGowan, and Union Planters (collectively the "Defendants"). They sought specific performance of the life insurance contract and damages under theories of bad faith, breach of contract, estoppel, negligent misrepresentation, and a general theory of negligence. Additionally, the Plaintiffs sought damages pursuant to the Tennessee Consumer Protection Act. The Defendants filed answers, and Valley Forge amended its answer to include a cross-claim against McGowan and a claim for indemnity against McGowan. Union Planters also amended its answer, asserting a cross-claim against Valley Forge rooted in an indemnification agreement between Valley Forge and Naifeh for the benefit of Union Planters.

The trial court determined that Naifeh's life insurance policy was in force at the time of his death and had not lapsed due to his failure to pay the premium due on January 25, 2000. As a result, the lower court ordered Valley Forge to pay the sum of $1,000,000.00 to Cathy Naifeh plus pre-judgment interest of 8% per annum beginning on June 1, 2000. Next, the trial court dismissed Valley Forge's counterclaim against McGowan. Further, it dismissed the claim of Decedent's estate and Cathy against McGowan for negligent misrepresentation and their claims against Union Planters. Additionally, the trial court found that if Union Planters were liable, it would be entitled to a judgment on its counter-claim against Valley Forge for indemnification. Finally, it dismissed the claims of Decedent's estate and Cathy against Union Planters and Valley Forge for violations of the

---

[11]The complaint was amended on September 18, 2002.

Tennessee Consumer Protection Act. Valley Forge filed its notice of appeal,[12] and Decedent's estate also filed a cross appeal, seeking review of the following issues, as we perceive them:

I. Whether the trial court erred when it admitted the testimony of Wayne Rasmussen;

II. Whether the trial court erred when it determined that the life insurance policy's "policy date" was December 1, 1998, and, therefore, the policy was in full force and effect on March 13, 2000, the date of Naifeh's death;

III. Whether the trial court erred when it determined that Valley Forge, by and through its agent, McGowan, and McGowan assumed the duty and obligation to keep Cathy advised of the status of Naifeh's life insurance policy and that Valley Forge was liable to Cathy for its own negligence and the negligence of McGowan;

IV. Whether the trial court erred when it dismissed Decedent's estate's claim against Union Planters, and whether the trial court erred when it determined that, even if Union Planters were liable, Valley Forge entered into an agreement wherein it agreed to indemnify Union Planters for any loss resulting from the dishonor of an electronic transfer for the payment of premiums; and

V. Whether the trial court erred when it dismissed the Plaintiffs' claims against Valley Forge, McGowan, and Union Planters under the Tennessee Consumer Protection Act.

For the following reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## Standard of Review

"[R]eview of findings of fact by the trial court in civil actions shall be *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d) (2004). We review questions of law *de novo* affording no presumption of correctness to the trial court's conclusions of law. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

---

[12]Valley Forge filed a motion to alter or amend the judgment of the lower court after it filed its notice of appeal. Apparently, some confusion arose over the amount of damages awarded by the trial court. From the judgment, it appeared that the trial court awarded Cathy an award of $1,000,000.00 under a theory of negligence in addition to the amount the trial court ordered Valley Forge to pay pursuant to the life insurance policy. The trial court granted Valley Forge's motion to alter or amend the judgment stating:

> The Court never intended to enter a Two Million Dollar ($2,000,000.00) judgment in this case. The judgment is therefore clarified that the entire money judgment rendered against Valley Forge Life Insurance Company is One Million Dollars ($1,000,000.00) plus pre-judgment interest at eight percent (8%) per annum from and after June 1, 2000 in favor [of] Cathy Ann Lyles Naifeh. The estate is not entitled to any money judgment in this case.

**Rasmussen's Testimony**

Valley Forge argues that it was error for the trial court to deny its motion to exclude the testimony of Wayne Rasmussen ("Rasmussen") which discussed the duty of McGowan as an insurance agent and a determination that the life insurance policy had not lapsed given the number of payments made by Naifeh.

Initially, we note that "questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). Rasmussen testified that he worked in the insurance industry for twenty years in several capacities including underwriting, adjusting, claims, management, risk assessment, and loss control management. Rasmussen also stated that he was familiar with the standard of care required of an insurance agent with life insurance policies and that he taught courses on that subject before and after becoming an attorney in 1989. Under the circumstances of this case, we cannot say that the trial court abused its discretion when it admitted the testimony of Rasmussen.

**Backdating of the Life Insurance Policy**

Valley Forge argues that the trial court erred when it determined that Naifeh's life insurance policy was in full force and effect at the time of his death on March 13, 2000. Specifically, the trial court found the life insurance policy became effective and had a policy date of December 1, 1998, when Naifeh paid the first full premium, Valley Forge had completed its underwriting procedures, and Naifeh was reclassified as a "nonsmoker class 4." As a result, the trial court determined that the premium payments of $149.99, $278.67, and $642.99 made on August 31, December 1, and December 9, 1998, respectively, extended life insurance coverage beyond Naifeh's death on March 13, 2000. However, Valley Forge argues that, rather than having paid a surplus of premium payments on the front end of the transaction, Naifeh agreed to a backdating of the policy, creating a start date of July 25, 1998, and resulting in a lapse of the policy for failure to pay the monthly premium payment due on January 25, 2000.

An insurance policy is subject to the same rules of enforcement and construction that apply to contracts in general. *Quintana v. Tenn. Farmers Mut. Ins. Co.*, 774 S.W.2d 630, 632 (Tenn. Ct. App. 1989) (citing *Great Am. Life Ins. Co. v. Armstrong*, 185 S.W.2d 505, 507 (Tenn. 1945)). When an appellate court is presented with an issue of contract interpretation, we must review the contract and make our own independent determination of the contract's meaning. *Hyde v. Ishikawa Gasket Am., Inc.*, No. M2002-02653-COA-R3-CV, 2003 Tenn. App. LEXIS 896, at *7 (Tenn. Ct. App. Dec. 22, 2003) (citing *Cagle v. Cagle*, No. 02A01-9710-CH-00265, 1998 Tenn. App. LEXIS 776, at *7 (Tenn. Ct. App. Nov. 18, 1998)).

The cardinal rule for interpreting a contract is to determine the intention of the parties and give effect to that intention. *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) (citing *Petty v. Sloan*, 277 S.W.2d 355 (Tenn. 1955)). We must

construe an insurance policy fairly and reasonably, giving the language its usual and ordinary meaning. *Quintana*, 774 S.W.2d at 632 (citing *Parker v. Provident Life & Accident Ins. Co.*, 582 S.W.2d 380, 383 (Tenn. 1979); *Metro. Life Ins. Co. v. Smith*, 554 S.W.2d 123, 128 n.4 (Tenn. 1977); *Dixon v. Gunter*, 636 S.W.2d 437, 441 (Tenn. Ct. App. 1982)). Our duty is to enforce a contract according to its plain terms. *Bob Pearsall Motors, Inc.*, 521 S.W.2d at 580 (citing *Eleogrammenos v. Standard Life Ins. Co.*, 149 S.W.2d 69 (Tenn. 1941)). When there is doubt or ambiguity as to meaning, an insurance contract must be construed favorably to the insured; however, courts will not create a new contract for the parties. *Berry v. Prudential Ins. Co. of Am.*, 134 S.W.2d 886, 889-90 (Tenn. Ct. App. 1939) (citing *United States Stove Corp. v. Aetna Life Ins. Co.*, 84 S.W.2d 582 (Tenn. 1935); *Moore v. Life & Cas. Ins. Co.*, 40 S.W.2d 403 (Tenn. 1931); *Green v. Fidelity & Guaranty Co.*, 185 S.W. 726 (Tenn. 1915); *Seay v. Ga. Life Ins. Co.*, 179 S.W. 312 (Tenn. 1915); *Knox v. Fraternal Aid Union*, 1 Tenn. App. 317 (Tenn. Ct. App. 1925)).

We note that the question raised in this case closely parallels the issues raised before this Court in *Berry v. Prudential Insurance Company of America*, 134 S.W.2d 886 (Tenn. Ct. App. 1939), therefore, a discussion of the circumstances and resolution of that case would be instructive. In *Berry*, the appeal concerned a life insurance policy, in the amount of $1,200.00, issued by the defendant life insurance company on Floyd Berry, which named his wife, Emelia, the beneficiary. *Id.* at 887. The policy had a date of issuance of May 13, 1935, and called for quarterly premium payments. *Id.* However, the policy provided that it was not effective until the first premium was paid and the policy was delivered to the insured. *Id.* at 888. Mr. Berry missed the premium due date of August 13, 1935, and the policy lapsed after thirty days on September 13, 1935. *Id.* at 887-88.

Subsequently, Mr. Berry sought to reinstate the policy and applied for reinstatement on October 17, 1935. *Id.* at 888. Such application was approved for reinstatement on October 29, 1935, and Mr. Berry paid the arrears due on August 13, 1935. *Id.* He died months later on December 19, 1935, and, presumably from the statement of the facts, Mr. Berry failed to pay the premium due on November 13, 1935. *Id.* at 887-88.

On appeal, Mrs. Berry argued that the policy did not begin until it was delivered to Mr. Berry on June 15, 1935. *Id.* at 888. Therefore, the second quarterly premium did not become due until September 15, 1935, rather than August 13, 1935. *Id.* Presumably, if this were true, the due date on the next premium would fall on December 15, 1935, rather than November 13, 1935, placing Mr. Berry's date of death within the thirty-day grace period provided in the policy.

The *Berry* court held that the date of the policy, not the date of delivery, controlled and determined when future premiums were due. *Id.* at 892. The court noted that dating the policy May 13, 1935, financially benefitted Mr. Berry. *Id.* at 888-89. Further, "the cash surrender value, the paid-up insurance value, the loan value and the maturity of the policy were based and calculated upon May 13 as the anniversary date of the policy." *Id.* at 888. The application for the reinstatement of the policy referred to the premium having a due date of August 13, 1935. *Id.* 889.

The *Berry* court then quoted the United States Supreme Court opinion of *Williams v. Union Central Life Insurance Company*, 291 U.S. 170 (1934), written by Mr. Chief Justice Hughes, wherein the Court stated:

> While it is highly important that ambiguous clauses should not be permitted to serve as traps for policyholders, it is equally important, to the insured as well as to the insurer, that the provisions of insurance policies which are clearly and definitely set forth in appropriate language, and upon which the calculations of the company are based, should be maintained unimpaired by loose and ill-considered interpretations.

*Berry*, 134 S.W.2d at 891 (quoting *Williams*, 291 U.S. at 180). The *Berry* court then quotes with approval an opinion of the Eighth Circuit Court of Appeals, addressing the practice of backdating an insurance policy:

> There is nothing to prevent an insurer and an insured from agreeing that the insurance contracted for shall not take effect until the policy, the written evidence of the agreement, is in the hands of the insured and until the insured has made his initial payment, and that when those events have occurred the policy shall be fully effective from the agreed date of issue for all purposes. This agreement, if the initial premium is paid at a later date than the agreed date of issue of the policy, may result in the insurer receiving compensation for a period during which no liability was imposed upon it. On the other hand, upon delivery of the policy and the payment of the first premium, the insured secures those advantages which flow from having the policy become effective as of the earlier date. This affects the period of its contestability, its loan and surrender values, dividends, *and, in some instances, the rate of premium*.

*Id*. (quoting *Rosenthal v. N.Y. Life Ins. Co.*, 94 F.2d 675, 680 (8th Cir. 1938), *rev'd on other grounds*, 304 U.S. 263 (1938)) (emphasis added). Under the facts in *Berry*, this Court determined that the policy premium was due on August 13, 1935, calculated from the date stated in the policy rather than the date the policy was delivered to Mr. Berry and held that the policy had lapsed before the date of Mr. Berry's death. *Id*. at 892.

We further note that backdating of a life insurance policy is permitted by statute with the following restriction:

> No policy of life insurance in form other than as prescribed in § 56-7-2307 shall be issued or delivered in this state, or be issued by a life insurance company organized under the laws of this state, if it contains any of the following provisions:
>
> . . . .
>
> (3) Policy Taking Effect Before Application Made. A provision by which the policy purports to be issued or to take effect as of a date *more than six (6) months before the*

*application therefor was made*, if thereby the premium on such policy or contract is reduced below the premium which would be payable thereon as determined by the nearest birthday or the last birthday of the insured at the time when such application was made . . . .

Tenn. Code Ann. § 56-7-2308(3) (2000) (emphasis added). Therefore, under the laws of Tennessee, backdating of an insurance policy is permissible as long as a policy is not backdated more than six months prior to the application for life insurance.

Under the circumstances of this case, we respectfully disagree with the trial court's conclusion that the life insurance policy began on, and had a policy date of, December 1, 1998. The application and the life insurance policy both denote that Naifeh's age, for the purposes of the policy, is fifty-one. Though Naifeh's estate and Cathy argue that the policy does not have a definition for "insurance age," the policy does define "policy age" as "the Insured's age on His birthday nearest the Policy Anniversary." In addition, several witnesses at trial stated that a person's "insurance age" or "policy age" differs from the conventional "chronological age." Their testimony at trial explained that, for purposes of a life insurance policy, a person's age is the age that person was or will be on his or her nearest birthday. At the time Naifeh applied for life insurance in August 1998, his age chronologically was fifty-one but his age for purposes of life insurance was fifty-two. However, if the policy date of July 25, 1998, is applied, Naifeh's "policy age" is fifty-one, the age listed on the policy and the application, because July 25, 1998, is six months and two days prior to Naifeh's fifty-second birthday on January 27, 1999.[13]

Further, the testimony at trial revealed that premiums for a fifty-one year old person were between ten and eleven percent less than premium payments for a fifty-two year old person. The premium rate for Naifeh was calculated based on a "policy age" of fifty-one. The testimony at trial appears to be undisputed that a life insurance policy for a person aged fifty-one will have lower premium rates than a policy for a person aged fifty-two.

With regard to the premium due dates, the premiums were paid by an electronic transfer of funds from Naifeh's business account on or about the twenty-fifth day of each month, further reflecting that July 25, 1998, was intended to be the start date for the policy. In addition, the premium paid in June 1999 was the last premium payment reduced by the fifteen percent discount for the first year. Additionally, the "expiry date," defined in the policy as "the date coverage under this policy ends," was listed as July 25, 2042. This date is forty-four years after the listed policy date of July 25, 1998, and each option for a schedule of policy premiums does not exceed forty-four years for the policy.

Finally, McGowan testified that he advised Naifeh of the backdating procedure and that Naifeh wished to backdate the policy in order to save money on the premium rate. All of the

---

[13]Additionally, it is noteworthy that Valley Forge had a company policy as of January 31, 1997, to save age by "subtract[ing] 6 months and 2 days from the Proposed Insured's date of birth."

circumstances indicate that Naifeh and Valley Forge intended to backdate the life insurance policy to July 25, 1998. Though this backdating of the policy resulted in a period from July 1998 until December 1998 during which Valley Forge was not exposed liability, Naifeh received the benefit of a lower premium rate in return. *See Berry*, 134 S.W.2d at 891 (quoting *Rosenthal v. N.Y. Life Ins. Co.*, 94 F.2d 675, 680 (8th Cir. 1938), *rev'd on other grounds*, 304 U.S. 263 (1938)). For these reasons, we reverse the trial court's conclusion that the life insurance policy began on December 1, 1998, rather than on July 25, 1998, as written.

### Valley Forge's and McGowan's Liability for Failing to Notify Cathy Naifeh

As an initial matter, we begin by noting that the trial court was correct when it dismissed Cathy's claim against McGowan for negligent misrepresentation. This Court has previously stated that to establish an action for negligent misrepresentation, a plaintiff must prove the defendant to be the following:

> . . . One who, in the course of his business, profession, or employment, or during a transaction in which he had a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon such information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982) (quoting *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 232 (Tenn. Ct. App. 1976)).

> The misrepresentation must consist of a statement of a material past or present fact. *Haynes v. Cumberland Builders, Inc.*, *supra* at 232. *See also Cumberland Portland Cement Co. v. Reconstruction Finance Corp.*, 140 F. Supp. 739, 751 (E.D. Tenn.1953), *aff'd* 232 F.2d 930 (6th Cir. 1956). Thus, statements of opinion or intention are not actionable. *See Fowler v. Happy Goodman Family*, 575 S.W.2d 496 (Tenn.1978); *Hamilton v. Galbraith*, 15 Tenn. App. 158, 166 (1932); *Cumberland Portland Cement Co. v. Reconstruction Finance Corp.*, *supra* at 751. Likewise, puffing or other sales talk is generally not actionable. *Sunderhaus v. Perel & Lowenstein*, 215 Tenn. 619, 388 S.W.2d 140 (1965). Similarly, conjecture or representations concerning future events are not actionable even though they may later prove to be false. *Young v. Cooper*, 30 Tenn. App. 55, 203 S.W.2d 376 (1947). *See Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585, 590 (Tenn. App.1980); *Cf. Springer v. Bank of Douglas*, 82 Ariz. 329, 313 P.2d 399 (1957).

*Id.*

In this case, McGowan's statement that he would "keep [Cathy] posted" is a statement of intention or a representation concerning a future event. Therefore, we agree with the trial court that

McGowan's actions, including this statement to Cathy, do not support a claim for negligent misrepresentation.

The Tennessee Supreme Court has previously stated the requirements for bringing a negligence claim:

> To bring a successful negligence claim, the plaintiff must establish each of the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation. *See White v. Lawrence*, 975 S.W.2d 525, 529 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d at 153.

*Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). Valley Forge argues that the trial court erred when it determined that Valley Forge's and McGowan's failure to give Cathy notice of Naifeh's failure to pay the January 25, 2000, premium was the proximate cause of the injury.

First, we examine the nature of the relationship between Valley Forge and McGowan. Section 56-6-147 of the Tennessee Code states as follows:

> Every insurance agent or limited insurance representative who solicits or negotiates an application for insurance of any kind shall, in any controversy arising from the application for insurance or any policy issued in connection therewith between the insured or insured's beneficiary and the insurer, be regarded as the agent of the insurer and not the insured or insured's beneficiary. This provision shall not affect the apparent authority of an agent.

Tenn. Code Ann. § 56-6-147 (2000); *see also Barfield v. Wilson*, 669 S.W.2d 91, 95 (Tenn. 1984). McGowan's role in the case at bar places him in the position as Valley Forge's agent and not the agent of Naifeh or Cathy. The Tennessee Supreme Court has previously noted that "an insurance company is bound by all acts, contracts, or representations of its agent, whether general or special, which are within the scope of his real or apparent authority." *Bill Brown Constr. Co., Inc. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 4 (Tenn. 1991) (quoting Couch on Insurance 2d § 71.9, n.8).

In addition to finding that McGowan would "keep [Cathy] posted" if any difficulties concerning the policy or the payment of premiums developed, the trial court made the following findings of fact:

> The Court finds that Cathy Naifeh's attorney, T.D. Forrester, in her presence, contacted Mr. McGowan who assured Ms. Naifehh [sic], and her attorney, that the required policy was in place, that it was being paid and would be paid by automatic withdrawal from John H. Naifeh's account and that Mr. McGowan understood that

he had the right to communicate with Cathy Naifeh and John H. Naifeh, concerning the policy.

The testimony of Cathy and T.D. Forrester ("Forrester") support these findings of fact.[14] Both Cathy and Forrester testified that Forrester, in a telephone conversation, relayed the terms and conditions of the marital dissolution agreement requiring Naifeh to obtain a life insurance policy. Further, the trial court found, and the record supports, that Cathy did not distinguish between McGowan and Valley Forge.

However, under these unique circumstances, we do not believe that McGowan's and Valley Forge's failure to notify Cathy of Naifeh's failure to pay the premium due on January 25, 2000, was the proximate, or legal, cause of the policy lapsing and terminating. The Tennessee Supreme Court has articulated a three-pronged test to determine if a breach of a duty is the proximate, or legal, cause of an injury: (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence. *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991).

In this case, the alleged negligent act by McGowan and Valley Forge was that they failed to notify Cathy of Naifeh's failure to pay the premium due on January 25, 2000. However, given that the premium was not paid because of the affirmative act of cancelling the electronic transfer and that the policy lapsed because of Naifeh's failure to pay the past due premium within the grace period, we cannot say that McGowan's and Valley Forge's failure to notify Cathy, who was a beneficiary of the policy, was a "substantial factor" in bringing about the lapse of the insurance policy. The effect of giving notice to Cathy that Naifeh failed to pay the premium due on January 25, 2000, is speculative at best, and there is no evidence to suggest, as the trial court states, that "[b]y failing to

---

[14]By finding that McGowan understood that he had the right to communicate with Cathy about Naifeh's life insurance policy, the trial court implicitly found that the testimony of McGowan concerning this issue was not credible. We are mindful of the following principle of review:

> Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). *Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics. Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (emphasis added).

notify Cathy Naifeh as promised, the policy in this case was determined to have 'lapsed' by the insurance company, resulting in Cathy Naifeh not receiving the $1,000,000.00 proceeds from the policy." Because a claim for negligence requires a complainant to prove all five elements, all other issues raised by the parties on appeal concerning the claims of negligence by Naifeh's estate and Cathy against McGowan and Valley Forge are hereby pretermitted.

### Valley Forge's and Union Planters' Liability Relating to the "Stop Payment" Order

Additionally, the parties argue over the trial court's determinations of liability with respect to the oral stop payment order given on January 10, 2000. In this case, Naifeh, during the application process for the life insurance policy, signed a form dated August 31, 1998, prepared by Valley Forge, and addressed to First State Bank which states as follows:

> As a convenience to me, I request and authorize [First State Bank] to pay and charge to my account electronic debits, checks or drafts drawn by and payable to [Valley Forge] provided there are sufficient collected funds in said account to pay the same upon presentation. I agree that your rights for such draw will be the same as if it were a draw personally signed by me. *This authority will remain in force until revoked by me in writing*, and until [First State Bank] actually receive[s] such notice. I agree that [First State Bank] will be fully protected in honoring any such draw.
>
> I agree that if any such draw is dishonored, whether with or without cause and whether intentionally or inadvertently, [First State Bank] will be under no liability even though such dishonor results in the forfeiture of insurance.

(emphasis added). The trial court found that, by failing to deliver this form to First State Bank, Valley Forge and McGowan were negligent because, had the form been delivered, the oral stop payment order would have never gone into effect and the January 25, 2000, premium would have been paid.

As noted above, a claim for negligence requires proof of five elements: (1) a duty of care owed by the defendant to the plaintiff; (2) defendant's breach of that duty; (3) injury; (4) causation in fact; and (5) proximate, or legal, cause. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). After examining the record in this case, this Court is unpersuaded by the trial court's determination that Valley Forge's and McGowan's failure to send this signed form to First State Bank was a proximate cause of the injury, namely, the lapse of the life insurance policy.

Again, as articulated above, the Tennessee Supreme Court has established a three-pronged test to determine whether a defendant's action was the proximate cause of the injury: (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence

-14-

and prudence. *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991). As in our discussion above concerning Valley Forge's and McGowan's failure to provide Cathy notice of Naifeh's failure to pay the premium due on January 25, 2000, under the unique circumstances of this case, we cannot say that Valley Forge's and McGowan's failure to send the form requiring written revocation is a proximate cause of the life insurance policy lapsing. As mentioned before, the affirmative act of the stop payment order[15] set the events in motion resulting in Naifeh's failure to pay the January 2000 premium. The failure to send the form to First State Bank does not appear to be a "substantial factor" and is too attenuated to constitute proximate cause in this case. Therefore, we reverse the trial court's determination that Valley Forge and McGowan were negligent in failing to send the form in question to First State Bank.

Next, we address the trial court's determination that Union Planters was not negligent in its handling of the stop payment order. We agree with the trial court's conclusion that Union Planters should not be liable to Naifeh's estate[16] under a claim of negligence for stopping payment of the January 25, 2000, premium.

First, Naifeh's estate asserts that Union Planters is liable under Title 15 of the United States Code. Specifically, section 1693h of Title 15 of the United States Code provides the following:

(a) Action or failure to act proximately causing damages

Subject to subsections (b) and (c) of this section, a financial institution shall be liable to a consumer for all damages proximately caused by–

(1) the financial institution's failure to make an electronic fund transfer, in accordance with the terms and conditions of an account, in the correct amount or in a timely manner when properly instructed to do so by the consumer, except where–
    (A) the consumer's account has insufficient funds;
    (B) the funds are subject to legal process or other encumbrance restricting such transfer;
    (C) such transfer would exceed an established credit limit;
    (D) an electronic terminal has insufficient cash to complete the transaction; or
    (E) as otherwise provided in regulations of the Board;
(2) the financial institution's failure to make an electronic fund transfer due to insufficient funds when the financial institution failed to credit, in accordance with

---

[15]Though the trial court did not find that Naifeh was the person who called in the stop payment order, Atkins, a representative for First State Bank, requested the account number from which electronic transfers were drawn, the amount of the electronic transfer for which cancellation was requested, the name of the payee on the transfer, the social security number of the account holder, and the date of the account's last deposit.

[16]During the trial, counsel for Cathy stated that she was not seeking a judgment against Union Planters, and, therefore, only Naifeh's estate has a claim against Union Planters for negligence.

-15-

the terms and conditions of an account, a deposit of funds to the consumer's account which would have provided sufficient funds to make the transfer, and

(3) the financial institution's failure to stop payment of a preauthorized transfer from a consumer's account when instructed to do so in accordance with the terms and conditions of the account.

15 U.S.C. § 1693h(a) (1998); *see also* 15 U.S.C. § 1693m (1998) (permitting financial institutions to be subject to civil liability and providing the method for determining the amount). Union Planters, however, argues that the provisions of 15 U.S.C. § 1693 *et seq.* do not apply in this case. Specifically, Union Planters notes the definition of the word "account" for purposes of the section:

As used in this subchapter–

. . . .

(2) the term "account" means a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan as defined in section 1602(i) of this title), as described in regulations of the Board, *established primarily for personal, family, or household purposes*, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement . . . .

15 U.S.C. § 1693a(2) (1998) (emphasis added). As the trial court noted, Naifeh's account at Union Planters was entitled "John H. Naifeh d/b/a Naifeh's Up In Smoke." Under the facts of this case, it appears that the account paying the insurance premiums was a business account rather than an account "established primarily for personal, family, or household purposes." Therefore, the provisions of 15 U.S.C. § 1693 *et seq.* are inapplicable to the facts of this case.

Assuming, *arguendo*, that the provisions of 15 U.S.C. § 1693 *et seq.* did apply in this case, Union Planters would still have no civil liability to Naifeh's estate. Specifically, section 1693e(a) provides as follows:

A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer. The financial institution *may* require written confirmation to be provided to it within fourteen days of an oral notification if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent.

15 U.S.C. § 1693e(a) (1998) (emphasis added). It appears that Union Planters is under no mandate, under federal or state law, to nullify the oral stop payment order of January 10, 2000, after fourteen days. *See* 15 U.S.C. § 1693e(a) (1998); *see also* Tenn. Code Ann. § 47-4A-211(a)-(b) (2001). Therefore, even if the provisions of 15 U.S.C. § 1693 *et seq.* applied, they would not provide that

-16-

Union Planters is liable for the handling of the oral stop payment order.[17]  For the reasons stated above, we reverse the trial court's determination that Valley Forge and McGowan are liable based on their failure to deliver the authorization form signed by Naifeh and affirm the trial court's judgment dismissing Naifeh's estate's claim against Union Planters for enforcing the oral stop payment order beyond fourteen days.[18]

## Tennessee Consumer Protection Act

Finally, we address the issue of whether the trial court erred when it dismissed the claims against Valley Forge, McGowan, and Union Planters under the Tennessee Consumer Protection Act ("Act").  On appeal, Naifeh's estate appears to rely upon section 47-18-104(b)(27) which prohibits "[e]ngaging in any other act or practice which is deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-104(b) (2001).  However, as stated in section 47-18-111(a)(1) of the Tennessee Code, the provisions of the Act do not apply to "[a]cts or transactions required or specifically authorized under the laws administered by, or rules and regulations promulgated by, any regulatory bodies or officers acting under the authority of this state or of the United States."  Tenn. Code Ann. § 47-18-111(a)(1) (2001).

As previously stated, the backdating of insurance policies is expressly permitted under the laws of this state pursuant to section 56-7-2308(3) of the Tennessee Code.  *See Smith v. First Union Nat'l Bank of Tenn.*, 958 S.W.2d 113, 116-17 (Tenn. Ct. App. 1997).  Further, the circumstances of this case and the insurance policy itself indicate that the parties intended to backdate the policy to July 25, 1998.  Therefore, we cannot say that the trial court erred when it dismissed the claim against Valley Forge and McGowan for violating the Act.

Additionally, we agree with the trial court's dismissal of the claim against Union Planters for violating the Act.  It appears that the Tennessee legislature intended Tenn. Code Ann. § 47-4A-101

---

[17]Additionally, we note that Naifeh signed a form stating the following: "I agree that if any such draw is dishonored, whether with or without cause and whether intentionally or inadvertently, [First State Bank] will be under no liability even though such dishonor results in the forfeiture of insurance."  Though section 1693*l* of title 15 of the United States Code provides that "[n]o writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter," as we have already noted, the provisions of 15 U.S.C. § 1693 *et seq.* do not apply.

[18]Because we hold that Union Planters is not liable to Naifeh's estate under a claim for negligence, we need not address the issue of whether Valley Forge agreed to indemnify Union Planters for any damages assessed against Union Planters.

*et seq.* to govern the electronic transfer at issue in this case.[19] Section 47-4A-211 of the Tennessee Code permits the following practice:

> (a) A communication of the sender of a payment order cancelling or amending the order may be transmitted to the receiving bank orally, electronically, or in writing. If a security procedure is in effect between the sender and the receiving bank, the communication is not effective to cancel or amend the order unless the communication is verified pursuant to the security procedure or the bank agrees to the cancellation or amendment.
>
> (b) Subject to subsection (a), a communication by the sender cancelling or amending a payment order is effective to cancel or amend the order if notice of the communication is received at a time and in a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order.

Tenn. Code Ann. § 47-4A-211(a)-(b) (2001). The statute governing the transfer at issue in this case does not state that an oral cancellation of an electronic transfer lapses after fourteen days as it would, for example, with a check under section 47-4-403(b) of the Tennessee Code. Tenn. Code Ann. § 47-4-403(b) (2001). The electronic transfer was cancelled orally, and the cancellation was verified pursuant to the security procedure in place. Therefore, Union Planters is not liable under the Act because its actions conform with the laws of this state. *See Smith*, 958 S.W.2d at 116-17. For these reasons, we affirm the trial court's dismissal of the claims filed under the Act against Valley Forge, McGowan, and Union Planters.

## Conclusion

For the reasons stated above, we affirm the trial court's admission of the testimony of Wayne Rasmussen. We reverse the trial court's determination that the life insurance policy was in force and

---

[19]In the comments to section 47-4A-102 of the Tennessee Code, the legislature states the following:

> The funds transfer governed by Article [Chapter] 4A is in large part a product of recent and developing technological changes. Before this Article [Chapter] was drafted there was no comprehensive body of law – statutory or judicial – that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders. Judicial authority with respect to funds transfers is sparse, undeveloped and not uniform. Judges have had to resolve disputes by referring to general principles of common law or equity, *or they have sought guidance in statutes such as Article [Chapter] 4 which are applicable to other payment methods*. But attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or the law of check collection have not been satisfactory.
>
> In the drafting of Article [Chapter] 4A, *a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment.*

Tenn. Code Ann. § 47-4A-102 cmt. (2001) (emphasis added).

effect at the time of John Naifeh's death. Additionally, we reverse the trial court's determination that Valley Forge was negligent. We affirm the trial court's dismissal of the claim for negligent misrepresentation against McGowan. We affirm the trial court's determination that Union Planters is not liable under a theory of negligence. Finally, we affirm the trial court's dismissal of the claims against Valley Forge, McGowan, and Union Planters for violations of the Tennessee Consumer Protection Act. This matter is remanded to the trial court for further proceedings consistent with this opinion. Costs of this appeal are taxed equally to Appellees, Niccole Naifeh and Henry J. Naifeh, as co-administrators of the estate of John H. Naifeh, and Cathy Ann Lyles Naifeh, and Appellant, Valley Forge Life Insurance Company, and its surety, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, JUDGE